McCarthy v. Hampton, 2015 NCBC 67.

STATE OF NORTH CAROLINA

COUNTY OF VANCE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 1173

JAMES A. MCCARTHY, SR., M.D.,                )
                  Plaintiff,                )
                                  )
                v.                )
                                  )
J. WELDON HAMPTON, M.D. and PREMIER )
WOMEN'S HEALTH PROFESSIONALS, P.A., )
                Defendants.                )
_____)
                                  )
J. WELDON HAMPTON, M.D. and PREMIER )
WOMEN'S HEALTH PROFESSIONALS, P.A., )
           Counterclaim-Plaintiffs,                )
                                  )
                v.                )
                                  )
JAMES A. MCCARTHY, SR., M.D. and PWHP )
REALTY, LLC,                )
           Counterclaim-Defendants.)

ORDER ON MOTION TO ENFORCE
MEDIATED SETTLEMENT
AGREEMENT

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Defendants J. Weldon Hampton, M.D. ("Hampton") and Premier Women's Health Professionals, P.A.'s ("PWHP," together with Hampton, "Defendants") Amended Motion to Enforce Mediated Settlement Agreement ("Motion to Enforce"). On June 3, 2015, the Court held a hearing on the Motion to Enforce.

THE COURT, after reviewing the Motion to Enforce, briefs in support of and in opposition to the Motion to Enforce, arguments of counsel and other appropriate matters of record, CONCLUDES that the Motion to Enforce should be GRANTED for the reasons stated herein.

*The Law Offices of J. Andrew McCarthy, Jr., P.A. by J. Andrew McCarthy, Jr., Esq., and Edmundson & Burnette, L.L.P., by J. Thomas Burnette, Esq. for Plaintiff James A. McCarthy, Sr., M.D.*

*Smith Moore Leatherwood LLP by Stephen W. Petersen, Esq. for Defendants/Counterclaim-Plaintiffs J. Weldon Hampton, M.D. and Premier Women's Health Professionals, P.A.*

McGuire, Judge.

## Procedural History

1.    Plaintiff initiated this action by his Complaint filed on December 1, 2014. Plaintiff's Complaint asserts claims for breach of contract, collection on a loan, judicial dissolution of PWHP, appointment of a receiver to manage and operate PWHP, breach of fiduciary duty, and a claim for an accounting and constructive trust.

2.    On December 10, 2014, Defendants filed their Verified Answer, Counterclaims, and Application for Temporary Restraining Order ("Answer"). Defendants assert counterclaims against Plaintiff and PWHP Realty, LLC ("Realty LLC") for breach of fiduciary duty, removal of Plaintiff as a director of PWHP, severance of Plaintiff's interest in PWHP, and divestment of Plaintiff's interest in Realty LLC. Realty LLC is a limited liability company in which Plaintiff, Hampton, and PWHP are the sole members.

3.    On April 2, 2015, Defendants filed the Motion to Enforce, seeking to enforce a document captioned "Essential Terms of Mediated Settlement Agreement with Formal Agreement to be Prepared Later" ("Essential Terms Agreement" or "ETA") signed by the parties and their respective counsel at a mediation held on March 6, 2015.

4.    The Motion to Enforce has been fully briefed and argued, and is ripe for determination.

## Factual Background

5.    This action arises from a dispute between Plaintiff and Hampton concerning the operation of PWHP, a medical practice owned in equal parts by Plaintiff and Hampton.

Plaintiff and Hampton entered into a Shareholder Buy/Sell Agreement ("Shareholder Agreement") that set out the terms and conditions under which the parties would purchase one another's interest upon the occurrence of certain events.

6. Plaintiff and Hampton are also the sole members of Realty LLC. Realty LLC was formed, as alleged by Defendants, by Plaintiff and Hampton in anticipation of an affiliation between PWHP and Duke University Medical Center's "Private Diagnostic Clinic, PLLC."[1] Realty LLC was to own a building which would be leased to Duke as part of the planned affiliation. Plaintiff, Hampton, and Realty LLC executed a Buy/Sell Agreement ("Realty LLC Agreement") that set out the terms and conditions under which the parties would purchase one another's interest on the occurrence of certain events.

7. On or about September 11, 2014, PWHP terminated Plaintiff's employment.[2] Pursuant to the terms of the Shareholder Agreement, Plaintiff's interest in PWHP was to be purchased by some or all of Defendants. Additionally, per the terms of the Realty LLC Agreement, PWHP's termination of Plaintiff's employment gave Realty LLC a right of first refusal and option to purchase Plaintiff's interest in Realty LLC.

8. In his Complaint, Plaintiff contends that Hampton failed to purchase Plaintiff's equity in PWHP as required by the terms of the Shareholder Agreement. Additionally, Plaintiff asserts a claim for collection on a $33,000.00 loan Plaintiff made to PWHP. Plaintiff also seeks judicial dissolution of PWHP, the appointment of a receiver over PWHP, an accounting from Defendants, and damages for certain actions of Hampton that Plaintiff contends constitute waste of PWHP's assets and breach of fiduciary duty.

9. Defendants make counterclaims for removal of Plaintiff from, and divestment of his equity in, PWHP and Realty LLC, and for breaches of fiduciary duty. Defendants'

---

[1] Countercl. ¶¶ 39-44.
[2] Compl. ¶ 17; Ans. ¶ 17.

Answer also includes an application for a temporary restraining order, preliminary injunction, and permanent injunction to enforce a covenant not to compete contained in Plaintiff's employment agreement with PWHP.

10. The parties filed a litany of motions, including Plaintiff's Motion for Preliminary Injunction and Plaintiff's Motion to Disqualify Counsel for Defendants. On February 24, 2015, the Court stayed all activity in this action until such time as the Court ruled on the Motion to Disqualify. In the same order, the Court set a hearing on Plaintiff's Motion to Disqualify for March 9, 2015.[3] The parties subsequently asked the Court to modify the stay to take the deposition of Lee Isley on March 5 to conduct a mediation on March 6, 2015.

11. On March 6, 2015, the parties conducted a mediation. At the conclusion of the mediation, the parties and counsel signed a document titled "Essential Terms of Mediated Settlement Agreement with Formal Agreement to be Prepared Later." The Essential Terms Agreement, by its own terms, is an "agreement . . . to memorialize essential terms of the mediated settlement agreement" in this action.[4] The Essential Terms Agreement provides, first, that Hampton will buy Plaintiff out of Realty LLC "pursuant to the terms of the [Realty LLC Agreement]." The ETA then provides a formula by which the "appraised value of the real property shall be determined." Next, the ETA provides a procedure by which PWHP will cease doing business and be dissolved. Ultimately, its assets will be distributed equally to Plaintiff and Hampton. Finally, the ETA includes a number of additional terms, including:

> 3. In connection with the counterclaims lodged by all counterclaimants, McCarthy shall pay $155,000 to PWHP.
>
> 4. McCarthy agrees that PWHP is authorized to pay up to $85,000 for attorneys' fees billed by Smith Moore Leatherwood in connection with

---

[3] *See* Order on Motion to Stay and Notice of Hearing (Feb. 24, 2015).
[4] Petersen Aff. ¶ 8, Ex. 1 ("Essential Terms Agreement").

representation of PWHP since 1 August 2014, including fees incurred in this case and in resolving the Martinez dispute.

5. McCarthy's noncompetition clause is deemed terminated.

6. Each side will execute full general releases of all parties.

7. Each side will file a Voluntary Dismissal with Prejudice of all claims

in this action.[5]

12.     On March 6, 2015, the mediator notified the Court that the parties had reached a settlement and that the March 9 hearing would not be necessary.  On Monday, March 9, Stephen W. Petersen ("Petersen"), counsel for Defendants, notified the Court by email that the "Parties successfully mediated and settled all claims on Friday." This email indicated that the parties were finalizing settlement documents and agreed that the hearing on Plaintiff's Motion to Disqualify, scheduled for that afternoon, was not necessary.[6] The email was copied to Andrew J. McCarthy, Jr. ("Attorney McCarthy") and J. Thomas Burnette ("Burnette") counsel for Defendants.  At no time did Attorney McCarthy or Burnette notify the Court that they had any disagreement with Peterson's email informing the Court that the parties had reached a settlement.[7]

13.     On March 7, 2015, Attorney McCarthy sent Petersen a draft of a proposed formal settlement agreement. This initial draft included some additional terms that were not contained in the ETA, and modified other terms contained in the ETA. For example, where the ETA provided that "McCarthy shall pay $155,000 to PWHP," Attorney McCarthy's initial draft provided that Plaintiff would satisfy that obligation by forgiving the $33,000 loan to

---

[5] *Id.*
[6] *See* Petersen Aff. ¶ 12, Ex. 4.
[7] Additionally, the Court has been presented with emails from both Burnette and Attorney McCarthy in which Burnette confirmed his understanding that this action was settled and McCarthy inquired as to who would inform the Court that the hearing on March 9 was no longer necessary. *See id.* ¶¶ 10-11, Exs. 2-3.

PWHP and by applying the amount owed to McCarthy by virtue of Hampton's acquisition of McCarthy's interest in Realty LLC.[8] Additionally, where the ETA provided that McCarthy's interest in Realty LLC would be purchased "pursuant to the terms of the [Realty LLC Agreement]," with a modification to the process by which the real estate would be valued, Attorney McCarthy's initial draft specifically states that the "valuation methodology set forth in the [Realty LLC Agreement] is supplanted with" the methodology provided in the initial draft. The methodology in the initial draft, however, contained a number of terms not provided for in the ETA, including a requirement that Hampton refinance obligations of Realty LLC.[9]

14. Following the circulation of Attorney McCarthy's initial draft, counsel for the parties continued negotiating a formal settlement agreement. However, on April 1, 2015, after weeks of failed negotiations, Petersen sent Attorney McCarthy and Burnette an email in which Petersen withdrew all prior offers of proposed final settlement language and circulated a final proposed settlement agreement "in which [Petersen] attempted to mirror the terms of the [ETA]."[10]

15. On April 2, 2015, Defendants filed the Motion to Enforce. Defendants contend that the ETA constitutes a binding and unambiguous agreement between the parties that should be enforced given the parties' inability to finalize a formal settlement agreement in this matter. Plaintiff, however, contends that the ETA is not an enforceable contractual agreement, but instead is simply an "agreement to agree" that left several material terms unaddressed.

---

[8] *Id.* ¶ 5.
[9] *See id.* ¶ 4.
[10] *Id.* ¶ 23.

<u>Discussion</u>

16.     In North Carolina, a party may attempt to enforce a settlement agreement by filing a motion in the action purportedly settled. *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 694 (2009). In such a circumstance, the summary judgment standard of review applies. *Id.* at 695. Under this standard, then, Defendants must show that, on the record before the Court, there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012).

17.     Under North Carolina law, settlement of claims is favored and "mediated settlement as a means to resolve disputes should be encouraged and afforded great deference." *Chappell v. Roth*, 353 N.C. 690, 692 (2001). Accordingly, a party seeking relief from enforcement of a mediated settlement agreement must overcome a "strong presumption that a settlement agreement reached by the parties through court-ordered mediation . . . is a valid contract." *Chappell v. Roth*, 141 N.C. App. 502, 505 (2000). Nevertheless, the enforceability of a mediated settlement agreement is governed by general principles of contract law. *Chappell*, 353 N.C. at 692.

18.     These principles of contract law require a meeting of the minds as to all "essential" or "material" terms of the agreement, and absent such a meeting of the minds there is no agreement. *Creech v. Melnik*, 347 N.C. 520, 527 (1998). A contract may exist, however, if the parties differ over a term that is not material. *See MacKay v. McIntosh*, 270 N.C. 69 (1967). Ultimately, when "the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court, and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Asheville Mall, Inc. v. F.W. Woolworth Co.*, 76 N.C. App. 130, 132 (1985) (internal citations omitted). "It must be presumed the parties intended what the language used clearly expresses, and the contract

must be construed to mean what on its face it purports to mean." *Hartford Acci. & Indem. Co. v. Hood*, 226 N.C. 706, 710 (1946) (internal citations omitted).

19.     In opposing the Motion to Enforce, Plaintiff makes essentially two arguments. First, Plaintiff argues that the ETA was not intended to be an agreement on the issues contained therein, but instead was simply a preliminary agreement to agree. Second, Plaintiff argues that the ETA did not address, or suggest a meeting of the minds as to, several material terms of the settlement of this action.

20.     In support of his first contention, Plaintiff argues that the language of the ETA clearly indicates the absence of any intention to form a final, binding agreement. Plaintiff argues that the title of the ETA indicating that a formal agreement would be prepared later justifies Plaintiff's belief "at the time of its execution that the Essential Terms Sheet was an incomplete agreement until subsequently reduced to a formal final agreement . . . ."[11] Plaintiff contends that such a preliminary agreement is unenforceable because it lacks the requisite intent of the parties to be bound to the terms contained therein.[12]

21.     In support of this position, Plaintiff declares that "*Boyce* [*v. McMahan*, 285 N.C. 730 (1974)] is controlling."[13] *Boyce* involved a writing placed in the public records related to certain real property. This writing purported to give an individual the right to purchase the land described. In an action to quiet title to the subject property, the court had to determine whether the writing constituted an agreement to grant the right to purchase as described, or whether the document was simply an "agreement to agree" such that the parties would not be finally bound by its terms. The North Carolina Supreme Court ultimately held that the writing "expresses the desires of the parties but not the agreement of both." *Boyce*,

---

[11] Pl.'s Br. Opp. Mot. Enforce 7.
[12] *Id.* at 5-7.
[13] *Id.* at 6.

285 N.C. at 734. In reaching this conclusion, the supreme court relied exclusively on the language of the document, regarding which the supreme court noted, "[t]he writing itself carries the terms which destroy its efficacy as a contract." *Id.* at 735. These terms specifically provided that the owner of the property and the developer "desire to enter into a preliminary agreement setting out the main features as to the desires of both parties and to execute a more detailed agreement at a later date." *Id.* at 731. The agreement, more than once, was referred to on the face of the document itself as a "preliminary agreement." *Id.*

22.     Plaintiff contends the ETA is simply a preliminary agreement. However, the Court finds *Boyce* readily distinguishable. Unlike *Boyce*, nothing on the face of the ETA indicates that this document was simply intended to outline the desires of the parties. Whereas the language at issue in *Boyce* provided that the parties to that document "desire to enter into a preliminary agreement setting out the main features as to the desires of the both parties," *id.*, the ETA provides that "[t]his agreement is . . . to memorialize essential terms of the mediated settlement agreement" in this action.[14] Thus, that the ETA on its face purports to be an agreement as to the terms therein, without any qualification that it is merely a preliminary agreement or a recitation of the parties' desires, distinguishes this matter from the facts of *Boyce*.

23.     Plaintiff also argues that the ETA was not intended to be a final agreement because it is subject to a condition subsequent, the execution of a "formal" settlement agreement.[15] The Court disagrees. Unlike *Boyce*, nothing in the ETA indicates that the agreement memorialized therein was conditioned on the execution of a final agreement. Aside from simply indicating that one would ultimately be prepared, ETA makes no other reference to a more formal agreement, much less any reference that raises an issue of fact as to whether

---

[14] ETA, preamble.
[15] Pl.'s Br. Opp. Mot. Enforce 7.

the parties intended that the ETA not be a binding agreement until confirmed in a future writing.

24.     On similar facts, the North Carolina Court of Appeals found that an agreement that purported "to serve as a memorandum agreement until proper complete documents can be drawn . . ." could be enforced notwithstanding the fact that a subsequent agreement was never executed. *N. Carolina Nat'l Bank v. Wallens*, 26 N.C. App. 580, 582 (1975). The court of appeals examined the language of the writing and concluded that, "it cannot be said that execution of a later agreement was a condition precedent to any contractual rights which might otherwise pertain. Furthermore, reference to a more 'complete' document does not necessarily indicate that material portions of the agreement have been left open for future negotiation." *Id.* at 584. Additionally, and especially important given Plaintiff's argument that this agreement was never intended to be final, the court of appeals noted that "if the parties in [*Wallens*] had manifested an intent not to become bound until the execution of a more formal agreement or document, then such an intent would be given effect." *Id.* at 583. However, like in *Wallens*, the terms of the ETA do not reflect any such intent.

25.     Ultimately, after reviewing the ETA, the Court concludes that the language used by the parties manifests a clear intent to be bound to the terms outlined in the ETA. The ETA is referred to, on its face, as an agreement, and includes no language indicating that it is preliminary, conditioned on any subsequent document or act, or other language that might show that the parties did not intend to be bound by its terms. Therefore, the Court concludes that no genuine issue of material fact exists as to the finality and binding nature of the ETA.

26.     Nevertheless, North Carolina contract law requires a meeting of the minds as to all "essential" or "material" terms of the agreement, and absent such a meeting of the minds there is no agreement. *Creech*, 347 N.C. at 527. A contract may exist, however, if the

parties differ over a term that is not material or omit such a term from their agreement. *MacKay*, 270 N.C. at 69; *see also Lane v. Scarborough*, 284 N.C. 407, 410 (1973) (recognizing that a contract "encompasses not only its express provisions but also all such implied provisions as are necessary to effect the intention of the parties unless express terms prevent such inclusion").

27. In determining whether a given term of an agreement is "material," courts have looked to the purpose and nature of the agreement itself, *see, e.g., Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC 3, ¶ 59 (N.C. Super. Ct. Apr. 28, 2003) (listing material terms in a real property lease), and also to the term at issue to determine whether the term was bargained for by one of the parties, *see Chappell v. Roth*, 353 N.C. 690 (2001) (refusing to enforce mediated settlement agreement where the parties expressly bargained for a "mutually agreeable" release). Even with the requisite intent to be bound to the terms of the ETA, that agreement will not be enforceable if it lacks the "essential" or "material" terms of the parties' agreement.

28. On this point, Plaintiff argues that the ETA omits several material terms. Plaintiff contends that the following "material terms" were omitted from the ETA:

a. The method for disposal or distribution of PWHP's intangible assets;

b. Whether Plaintiff would have access to the business records of Realty LLC and PWHP or PWHP's facility;

c. The timing of the payments required by the ETA;

d. Whether Hampton's noncompetition clause would be terminated;

e. The amount of Plaintiff's attorneys' fees to be paid by PWHP;

f. Whether Plaintiff would be released as guarantor on certain PWHP debt; and

g.    Whether the liquidity discount called for in the Realty LLC Agreement would apply to Hampton's purchase of Plaintiff's interest in Realty LLC.[16]

The Court will address each contention in turn.

29.    Plaintiff first argues that the ETA left open the question of what would be done with PWHP's intangible assets, chiefly PWHP's service mark and other intellectual property. The ETA, however, expressly addressed the distribution of PWHP's assets, both tangible and intangible.  The ETA provides that "[w]ithin 90 days, McCarthy and Hampton will equally divide the Furniture Fixtures and Equipment, including but not limited to medical supplies, medical devices [,] office supplies and computers."  With regard to all other assets, the ETA provides that "[f]or two years, [PWHP] will continue to operate[,] to pay liabilities[,] and collect receivables and wind down the business" and "[a]t the end of the two years, or sooner if all liabilities and assets are concluded, [PWHP] shall be dissolved and the assets distributed equally."[17]  In other words, the ETA could not be clearer as to the method for and timing of the distribution of PWHP's assets.  Based on the agreed-upon procedure in the ETA, PWHP's intangible assets would be distributed along with all PWHP's other remaining assets after two years. The ETA is not rendered unenforceable simply because Plaintiff now wishes to dispose of PWHP's property in a manner other than that which was agreed upon. *See Smith v. Young Moving & Storage, Inc.*, 167 N.C. App. 487, 494 (2004) ("The fact that plaintiff later changed [his] mind does not render the settlement agreement unenforceable.").

30.    Plaintiff next argues that the ETA lacks all material terms because it does not provide Plaintiff access to PWHP's facility, or to the records of PWHP and Realty LLC. However, there is nothing in the ETA that suggests that until such time as his interest is terminated, Plaintiff does not continue to have all of the rights to inspect books and records

---

[16] Pl.'s Br. Opp. Mot. Enforce 9-15.
[17] ETA ¶ 1.

provided by statute or in the governing documents of these entities. As noted in the hearing, those rights can be enforced by court order if Plaintiff believes they are not being honored. In addition, the ETA expressly provides Plaintiff with audit privileges over PWHP and the right to oversee the wind down of that entity. Accordingly, it appears clear to the Court that the parties considered Plaintiff's ability to inspect records during the winding down of PWHP before reducing their agreement to writing. Here again, that Plaintiff now seems dissatisfied with the agreement reached does not render the ETA unenforceable.

31.     Plaintiff's next argues that the ETA does not expressly provide when and how the payments required under the ETA will be made. The court of appeals, however, has held that the absence of terms regarding timing or manner of proposed settlement payments does not necessarily render an agreement ambiguous or unenforceable. *Capps v. NW Sign Indus. of N.C., Inc.*, 2007 N.C. App. LEXIS 1816, at \*20 (N.C. Ct. App. Aug. 21, 2007). In such a situation, a court will presume a reasonable time and manner. *Id.*; *see also Sockwell & Assocs., Inc. v. Sykes Enters., Inc.*, 127 N.C. App. 139, 142 (1997).

32.     Plaintiff also contends that the $155,000 payment he is required to make under paragraph 3 of the ETA should be subject to setoffs, or reductions, for amounts Plaintiff believes he is owed, including the $33,000 loan that is the subject of Plaintiff's second claim for relief.  The parties strongly disagree over whether such a setoff arrangement was addressed during the mediation. Nevertheless, Plaintiff and Attorney McCarthy executed the ETA that unambiguously states that Plaintiff "shall pay $155,000 to PWHP."[18] If the ability to setoff this amount owed truly was a material term at the time of the mediation, it is perplexing to the Court why such a term was not embodied in the ETA before that document was signed by Plaintiff and Attorney McCarthy.

---

[18] ETA ¶ 3.

33. Not only is Plaintiff's post-mediation position regarding the setoff inconsistent with paragraph three of the ETA, it contradicts the procedure set out in paragraph two regarding the winding down of PWHP. That procedure provides that only at the end of two years, or once all liabilities are resolved, will the remaining assets of PWHP be distributed to Plaintiff and Hampton. To credit Plaintiff now with the full value of the $33,000 loan would give this debt a priority over other unsecured debt of PWHP. Such priority is inconsistent with the procedure outlined in paragraph two which provides for a pro rata distribution of any remaining assets of PWHP. Therefore, to accept Plaintiff's position would require the Court to set aside the unambiguous language of the ETA.

34. Ultimately, as to the time and manner of payment, the Court concludes that paragraph 3 is unambiguous in its terms. That paragraph requires a payment, not a setoff or other alternative arrangement, from Plaintiff to PWHP. The absence of a provision regarding timing does not defeat the enforceability of this term, or of the ETA as a whole. The Court can, and will, presume a reasonable time and manner for payment. *See Capps*, 2007 N.C. App. LEXIS 1816, at *20.[19]

35. Plaintiff next contends that while the ETA expressly terminates Plaintiff's noncompetition agreement, it does not address the enforceability of Hampton's noncompetition agreement. There is nothing before the Court that suggests that the ongoing validity of Hampton's noncompetition agreement was the subject of negotiation or otherwise contemplated by the parties in this settlement. Conversely, Plaintiff's noncompetition agreement is the subject of a pending Motion for Preliminary Injunction and its validity was

---

[19] Although not strictly implicated by the enforcement of the ETA, the Court finds the line of North Carolina case law addressing the failure to specify the manner of payment in a real property option contract instructive. These cases routinely hold that the omission of a term dealing with the manner and form of payment is not fatal to the existence of the agreement, and in such an instance, the Court will require payment to be made in cash upon delivery of the property. *Hurdle v. White*, 34 N.C. App. 644, 651 (1977) (citing *Kidd v. Early*, 289 N.C. 343, 358 (1976)).

contested throughout this litigation. As such, it is clear that while the termination of Plaintiff's noncompetition agreement was material to the settlement of this action, the enforceability of Hampton's was not. Additionally, although Plaintiff now raises the materiality of this issue, the draft circulated by Attorney McCarthy following the mediation contained no reference to Hampton's noncompetition agreement. Accordingly, the Court concludes that the issue of Hampton's noncompetition agreement was not material to the settlement of this action such that the failure to address it in the ETA would defeat the enforceability of the ETA.

36. Plaintiff next raises the question of whether PWHP will pay any portion of his attorneys' fees given that the ETA provides for payment of Hampton's attorneys' fees up to a set sum. While the representation of Hampton, PWHP, and Realty LLC by Petersen was placed at issue in this litigation by Plaintiff's Motion to Disqualify Counsel, the representation of Plaintiff was not. Instead, it appears to the Court that this issue was first raised by Plaintiff in connection with the Motion to Enforce, and was not the subject of any negotiation during or immediately following mediation.[20] Further, paragraph 7 of the initial draft settlement agreement, prepared by Attorney McCarthy, specifically provides that "McCarthy will bear his own fees and costs incurred" in this action.[21] Therefore, the Court can only conclude that the issue of Plaintiff's attorneys' fees is not a material term of the settlement of this action, nor of the ETA. Accordingly, the ETA's failure to specifically address the issue does not defeat its enforceability.

37. Plaintiff next argues that the ETA lacks any provision that releases Plaintiff as guarantor for loans made to Realty LLC and that, because this was a "material term," the ETA is unenforceable. The Court disagrees. Nothing in the record before the Court indicates

---

[20] *See* McCarthy Aff. (May 29, 2015) ¶ 33.
[21] Petersen Aff. Ex. 5.

that the release of Plaintiff as guarantor for these loans was a bargained for term of the parties' settlement agreement. *Cf. Chappell*, 353 N.C. at 693 (noting that agreement was given in exchange for a "full and complete release, *mutually agreeable to both parties*") (emphasis added). Accordingly, given that the issue only appears to have been raised after Plaintiff signed the ETA and in the absence of any evidence to the contrary, the Court concludes that the release of Plaintiff as guarantor for loans made to Realty LLC was not a material term to the parties' agreement or the settlement of this action.

38. Plaintiff's final argument as to the absence of material terms in the ETA, or the ETA's failure to reflect a meeting of the minds, involves whether the liquidity discount provided for in the Realty LLC Agreement, as discussed below, would apply to the buy-out procedure in paragraph 1 of the ETA.

39. The Realty LLC Agreement provides a procedure by which the shares of a withdrawing member would be purchased.[22] Under the terms of the Realty LLC Agreement itself, the valuation procedure contained therein applies "unless the Members shall mutually agree in writing to a different value or valuation methodology."[23] This procedure provides a mechanism for valuing the property, both real and personal, of Realty LLC, which would then be used to calculate the value of each member's interest in the entity.[24] This procedure also provides that the "Determination of Purchase Price," the price resulting from the above-described procedure, "shall be reduced to take into account minority and/or marketability interests as follows. . . ."[25] The Realty LLC Agreement then provides, in some detail, a procedure for calculating this liquidity discount.

---

[22] Realty LLC Agmt. § 2.
[23] *Id.* § 2(b)
[24] *Id.* § 2(c).
[25] *Id.* § 2(d).

40.     In paragraph 1 of the ETA, the parties outline a truncated procedure for valuing Plaintiff's interest in Realty LLC. This procedure follows, in general terms, the Realty LLC Agreement by providing that each member must retain an appraiser to conduct an appraisal by April 10. If no agreement is reached as to purchase price after those initial appraisals, the two original appraisers select a third appraiser whose appraisal will bind the parties.[26] A similar procedure is provided should there be "disagreement about the liabilities determination."[27]

41.     In opposing the Motion to Enforce, Plaintiff argues that the procedure in the ETA entirely supplants the terms of the Realty LLC Agreement, and, therefore, the liquidity discount does not apply to the buyout of McCarthy's interest in Realty LLC. This position, however, is inconsistent with the terms of the ETA and the terms of the Realty LLC Agreement.

42.     The ETA's buyout provision is clear. That document, signed by Plaintiff and Attorney McCarthy, indicates that "Hampton will buy out [Plaintiff] pursuant to the terms of the" Realty LLC Agreement. The ETA then provides that "the appraised value of the real property shall be determined" by the procedure outlined above. Not only does the ETA say nothing about supplanting the entire Realty LLC Agreement buyout procedure, it specifically incorporates that procedure with the sole modification being the procedure for valuing the real property.[28] Determining the value of the real property owned by Realty LLC is only a small portion of the buyout procedure contained in the Realty LLC Agreement. That procedure also includes provisions for valuing personal property, for establishing each member's interest in Realty LLC's assets, and for discounting the purchase price based on

---

[26] ETA ¶ 1.

[27] *Id.*

[28] This change, as argued by counsel for Defendants, was intended to shorten the time within which these appraisals would be conducted to enable the buyout of Plaintiff's shares on an expedited basis.

marketability.[29] The ETA does not expressly alter or supplant any of these other provisions. Therefore, pursuant to the terms of the ETA, the buyout of Plaintiff's interest is "pursuant to" these remaining terms, including the liquidity discount.[30]

43.    For the reasons discussed above, the Court finds Plaintiff's contention that the ETA lacks material terms of the parties' agreement unpersuasive and concludes that the ETA contains all material terms required for enforcement.

44.    The Motion to Enforce also contains a request for an order requiring the parties to execute general releases by a date set by the Court. A clear release of claims, absent proof of a contrary intent, is effective to discharge all claims pending in the litigation. *Hardin*, 199 N.C. App. at 699. Here, the ETA clearly indicated that the parties intended and agreed to fully release all parties in connection with the settlement of this matter. Notably, in opposing the Motion to Enforce, Plaintiff does not argue that no meeting of the minds existed as to the nature or extent of the agreed upon releases. Additionally, in the draft formal settlement agreements sent from Attorney McCarthy to Petersen and from Petersen to Attorney McCarthy,[31] each side proposed broad general releases that were strikingly similar in their language. Because the Court concludes that the language of the ETA expresses a clear intent that all issues in the litigation had been fully and fairly resolved, the ETA "was effective to release pending claims even if the parties did not later execute a more comprehensive statement of the release." *DeCristofor v. Givens*, 2015 NCBC 53, ¶ 57 (N.C. Super. Ct. May 29, 2015). Accordingly, the Court concludes that no additional releases are necessary to resolve this action.

---

[29] *See* Realty LLC Agmt. § 2.
[30] ETA ¶ 1.
[31] Petersen Aff. Ex. 10.

45. Finally, Defendants' Motion to Enforce contains what appears to be a perfunctory request for relief that the Court make a "determination of attorneys' fees and costs to be awarded allowed by law." Defendants have not briefed, and did not make argument at the hearing regarding, this requested relief. The Court is not aware of any authority that would permit it to award Defendants attorneys' fees and costs in conjunction with its enforcement of the ETA. Accordingly, to the extent that Defendants are requesting an award of attorneys' fees and costs in conjunction with bringing the Motion to Enforce, the Court concludes in its discretion that the request should be DENIED.

Conclusion

46. Ultimately, the Court concludes that the ETA is an enforceable, contractual agreement that contains all the material terms required. The ETA is unquestionably supported by consideration, either by the dismissal of claims, the purchase of equity, or by any other of the terms therein that constitute a bargained for exchange between the parties. Moreover, the terms of the ETA are clear and unambiguous. The ETA states on its face that it "memorialize[s] *essential terms* of the mediated settlement agreement" negotiated between the parties after mediation. That the parties contemplated a future document that more formally memorialized their agreement does not, standing alone, render the ETA unenforceable. *See Wallens*, 26 N.C. App. at 584. Similarly, Plaintiff's subsequent attempt to reopen terms already addressed by the ETA, or in some cases directly contradicted by the ETA, does not defeat the contractual validity of the ETA. *See Smith*, 167 N.C. App. at 494. Therefore, the Court concludes that the Motion to Enforce should be GRANTED, except that Defendants' request for an award of attorneys' fees, to the extent Defendants seek attorneys' fees in addition to those provided for in the ETA, should be DENIED.

THEREFORE, IT IS ORDERED that:

47. The Motion to Enforce is GRANTED, except that Defendants' request for an award of attorneys' fees, to the extent Defendants seek attorneys' fees in addition to those provided for in the ETA, is DENIED.

48. Plaintiff's interest in Realty LLC shall be valued as provided in the Realty LLC Agreement, except to the extent that procedure is supplanted by the ETA. Specifically, the procedure outlined in the ETA shall supplant only section 2(c) of the Realty LLC Agreement. Sections 2(a), (b), and (d) shall remain applicable to the buyout of Plaintiff's interest in Realty LLC. The parties shall exchange real estate appraisals on or before August 5, 2015.[32]

49. All payments called for in the ETA shall be made within a reasonable time after entry of this Order. After considering the status of this matter, the Court concludes that the following payment deadlines are reasonable under the circumstances.

    a. The payment by paragraph 1 of the ETA shall occur no later than 30 days after the conclusion of the appraisal process outlined in that paragraph.

    b. The payment required by paragraph 3 of the ETA shall be made on or before Wednesday, July 22, 2015. This payment shall be made in cash, unless otherwise agreed to in writing, by the parties.

50. This matter is hereby DISMISSED.

This the 1st day of July, 2015.

        /s/ Gregory P. McGuire
        Gregory P. McGuire
        Special Superior Court Judge
         for Complex Business Cases

---

[32] The ETA originally provided the parties with a total of 35 days from the time of its execution to prepare and exchange real estate appraisal. This deadline having passed, the Court reestablishes this deadline based on the same 35 day time period.